UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| PARISH OF LIVINGSTON,<br>Individually and on Behalf<br>of a Class of Persons Similarly<br>Situated | ) <br> ) <br> ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) | |
| v. | ) <br> ) | CIVIL ACTION NO. _____ |
| MCKINSEY & COMPANY, INC.;<br>MCKINSEY & COMPANY, INC. UNITED<br>STATES; MCKINSEY & COMPANY, INC.<br>WASHINGTON D.C. | ) <br> ) <br> ) <br> ) | **CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |
| Defendants. | ) <br> ) | |

_____

## I. PRELIMINARY STATEMENT

1.     Plaintiffs provide essential services for their citizens and residents, including services for families and children, public assistance, public welfare, and other care and services for the health, safety and welfare of their citizens and residents. The rising numbers of people addicted to opioids have led to significantly increased costs, as well as a dramatic increase of social problems, including, but not limited to, drug abuse and the commission of criminal acts to obtain opioids.[1]

2.     Opioids include brand-name drugs like Oxycontin and Percocet, as well as generic drugs like oxycodone and hydrocodone.  These drugs are derived from or possess properties similar to opium and heroin, and, as such, they are highly addictive and dangerous.

3.     Opioid analgesics are widely diverted and improperly used, and the widespread abuse of opioids has resulted in a national epidemic of opioid overdose deaths and addictions.[2] The crisis arose from opioid manufacturers' (such as Purdue Pharma) deliberately deceptive marketing strategy to expand opioid use.  Defendants played an integral role in creating and deepening the opioid crisis.

4.     Plaintiffs bring this action to recover damages from Defendants and to eliminate the hazard to public health and safety caused by the opioid epidemic, to abate the nuisance caused thereby, and to recoup monies that has been spent, or will be spent, because of Defendants' conduct in fueling the epidemic. Defendants knew of the dangers of opioids, and of Purdue's prior misconduct, but nonetheless advised Purdue to improperly market and sell OxyContin.

---

[1] As used herein, the term "opioid" or "opioids" refers to the entire family of opiate drugs including natural, synthetic and semi-synthetic opiates.

[2] *See* Nora D. Volkow & A. Thomas McLellan, *Opioid Abuse in Chronic Pain—Misconceptions and Mitigation Strategies*, 374 N. Eng. J. Med. 1253 (2016).

## II. PROCEDURAL STATEMENT

5.      The headings contained in this Class Action Complaint are intended only to assist in reviewing the statements and allegations contained herein.  To avoid the unnecessary repetition in each section, Plaintiffs affirm and incorporate each paragraph in each section of this Class Action Complaint as though fully set forth therein.

6.      The factual allegations contained in this Class Action Complaint are ***not exhaustive*** and are presented throughout this Class Action Complaint solely to provide the Defendant with the requisite notice of the basis for the Plaintiffs' allegations and claims.  The Plaintiffs expressly reserve the right to plead additional facts where and as necessary to ensure complete relief.

## III. PARTIES

### A.      Plaintiffs

7.      The plaintiff in this case is a parish in Louisiana that has been damaged, and continue to be damaged by the Defendants' conduct.

8.      Parish of Livingston, Louisiana (hereinafter collectively referred to as "Plaintiff," "Plaintiffs," or "Plaintiff Communities") has the authority under the laws of the State of Louisiana to bring this lawsuit.

9.      Plaintiff is responsible for the public health, safety and welfare of their citizens.

10.      In Plaintiff Communities, opioid abuse, addiction, morbidity and mortality has created a serious public health and safety crisis, is a public nuisance, and Defendants' actions have caused and contributed to this public nuisance.

11.      Defendants' actions created the foreseeable opioid crisis and public nuisance for which Plaintiff seeks relief.

12.    Plaintiff has sustained economic damages as a direct and proximate result of Defendants' conduct as alleged herein.  Categories of past and continuing damages include, but are not limited to; (1) costs associated with law enforcement and public safety relating to the opioid epidemic: (2) costs for providing emergency services, medical care, therapeutic care, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (3) costs for prescription drug purchases; and (4) such other costs as may be proven in this litigation.

13.    The Parish of Livingston, Louisiana brings this action on its behalf, and on behalf of all other Louisiana parishes and municipalities similarly situated.

14.    Plaintiff also seeks the means to abate the opioid epidemic created by Defendants' wrongful and/or unlawful conduct.

15.    Plaintiff is authorized by law to abate any nuisance and prosecute any person or entity who creates, continues or contributes to such nuisance, and to prevent injury and annoyance from such nuisance.

16.    Plaintiff has standing to bring this action and recover damages incurred as a result of Defendants' acts and omissions.

**B.    Defendants**

17.    Defendant **McKinsey & Company, Inc.** is a corporation organized under the laws of the State of New York, whose principal place of business is located at 711 Third Avenue, New York, NY 10017.

18.    Defendant **McKinsey & Company, Inc. United States** is a corporation organized under the laws of the State of Delaware, whose principal place of business is located at 55 E 52nd Street, New York, NY 10022.

19.    Defendant **McKinsey & Company, Inc. Washington D.C.** is a corporation organized under the laws of the State of Delaware, whose principal place of business is located at 1200 19th Street, NW, Suite 1100, Washington DC 20036, and at all times relevant hereto was authorized to do business and was doing business in the State of Louisiana.

20.    McKinsey & Company, Inc., McKinsey & Company, Inc. United States and McKinsey & Company, Inc. Washington D.C. are referred to collectively as "McKinsey."

21.    McKinsey is a worldwide management consultant company. From approximately 2004-2019, McKinsey provided consulting services to Purdue Pharma L.P., working to maximize sales of OxyContin and knowingly perpetuating the opioid crisis. McKinsey has also provided related consulting services to other manufacturers of opioids.

## IV.  JURISDICTION AND VENUE

22.    Jurisdiction and venue are proper in the Middle District of Louisiana.

23.    Jurisdiction of this Court arises under the laws of the United States 28 U.S.C. § 1332(d) as this is a class action, the plaintiff is a citizen of different states and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

24.    This Court has personal jurisdiction over Defendants because, at all relevant times, Defendants have purposely availed themselves to the privilege of doing business in Louisiana, including by engaging in the business of researching, designing, and implementing marketing and promoting strategies for various opioid manufacturers, including Purdue, in support of their sales and marketing of opioids in Louisiana.  Further, Defendants do business by agent in Louisiana, directly and through the purposeful direction of their actions towards Louisiana, and have the requisite minimum contacts with Louisiana necessary to constitutionally permit the exercise of jurisdiction.

25.    Venue is proper in the Middle District of Louisiana because a substantial part of the events or omissions giving rise to the claims occurred in the Middle District of Louisiana, and all other related claims are also proper in the Middle District of Louisiana as additional claims against the named Defendants.  Further, Defendants have caused harm to the Plaintiff and to Class Members residing in the Middle District of Louisiana.

26.    The Court also has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because the state law claims are part of the same case or controversy.

## V.  TOLLING AND FRAUDULENT CONCEALMENT

### A.    Equitable Estoppel and Fraudulent Concealment

27.    Plaintiff continues to suffer harm from the unlawful actions by the Defendants.

28.    The continued tortious and unlawful conduct by the Defendants causes a repeated or continuous injury. The damages have not occurred all at once but have continued to occur and have increased as time progresses. The harm is not completed nor have all the damages been incurred until the wrongdoing ceases. The wrongdoing and unlawful activity by Defendants have not ceased. The public nuisance remains unabated.

29.    Defendants are equitably estopped from relying upon a statute of limitations defense because, alongside Purdue, Defendants undertook active efforts to deceive Plaintiff and to purposefully conceal their unlawful conduct.  Defendants were aware that the opioid manufacturers, such as Purdue, and the distributors were fraudulently assuring the public and Plaintiffs that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with the goal of protecting their registered manufacturer or distributor status in the State and to continue generating profits. Notwithstanding the allegations

set forth above, McKinsey and Purdue affirmatively assured the public and Plaintiff that they were working to curb the opioid epidemic.

30.     McKinsey and Purdue were deliberate in taking steps to conceal their conspiratorial behavior and active role in the deceptive marketing and the oversupply of opioids through overprescribing and suspicious sales, all of which fueled the opioid epidemic.

31.     McKinsey's consulting services were given confidentially, and both McKinsey and Purdue concealed the content of those services from the public.

32.     McKinsey and Purdue also concealed the existence of Plaintiff's claims by hiding their lack of cooperation with law enforcement and affirmatively seeking to convince the public that Purdue's legal duties to report suspicious sales had been satisfied through public assurances that they were working to curb the opioid epidemic. They publicly portrayed themselves as committed to working diligently with law enforcement and others to prevent diversion of these dangerous drugs and curb the opioid epidemic, and they made broad promises to change their ways insisting they were good corporate citizens.  These repeated misrepresentations misled regulators, prescribers, and the public, including Plaintiff, and deprived Plaintiff of actual or implied knowledge of facts sufficient to put Plaintiff on notice of potential claims.

33.     Plaintiff did not discover the nature, scope and magnitude of McKinsey's misconduct, and its full impact on Plaintiff, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

34.     Purdue and McKinsey's campaign to misrepresent and conceal the truth about the opioid drugs that they were aggressively pushing on Plaintiff deceived the medical community, consumers, and Plaintiff.

35.    Further, Purdue and other opioid manufacturers also concealed and prevented discovery of information, including data from the ARCOS database.

36.    McKinsey intended that their actions and omissions made with Purdue would be relied upon, including by Plaintiff.  Plaintiff did not know and did not have the means to know the truth, due to McKinsey and Purdue's actions and omissions.

37.    Plaintiff reasonably relied on McKinsey and Purdue's affirmative statements regarding their purported compliance with their obligations under the law and consent orders.

38.    The purpose of the statutes of limitations period is satisfied because Defendants cannot claim prejudice due to late filing where the Plaintiff filed suit promptly upon discovering the facts essential to its claims, described herein, which Defendants knowingly concealed.

**B.    McKinsey and Purdue Persisted in the Fraudulent Scheme Despite a Guilty Plea and Large Fine**

39.    In May 2007, Purdue and three of its executives pled guilty to federal charges of misbranding OxyContin in what the company acknowledged was an attempt to mislead doctors about the risk of addiction.  Purdue was ordered to pay $600 million in fines and fees.  In its plea, Purdue admitted that its promotion of OxyContin was misleading and inaccurate, misrepresented the risk of addiction and was unsupported by science.  Additionally, Michael Friedman, the company's president, pled guilty to a misbranding charge and agreed to pay $19 million in fines; Howard R. Udell, Purdue's top lawyer, also pled guilty and agreed to pay $8 million in fines; and Paul D. Goldenheim, its former medical director, pled guilty as well and agreed to pay $7.5 million in fines.

40.    Nevertheless, even after the settlement, Purdue continued to pay doctors on speakers' bureaus to promote the liberal prescribing of OxyContin for chronic pain and fund seemingly neutral organizations to disseminate the message that opioids were non-addictive as

well as other misrepresentations.  At least until early 2018, Purdue continued to deceptively market the benefits of opioids for chronic pain while diminishing the associated dangers of addiction. After Purdue made its guilty plea in 2007, it assembled an army of lobbyists to fight any legislative actions that might encroach on its business.  Between 2006 and 2015, Purdue and other painkiller producers, along with their associated nonprofits, spent nearly $900 million dollars on lobbying and political contributions -- eight times what the gun lobby spent during that period. McKinsey participated extensively in these actions and provided Purdue with strategies and assistance to maximize sales as described in this complaint.

41.    As all of the government actions against the Purdue and McKinsey demonstrate, McKinsey knew that the actions it took with Purdue were unlawful, and yet deliberately proceeded in order to increase Purdue's sales and profits, and in turn to serve McKinsey's financial interests.

## VI.  ADDITIONAL FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### A.    The Opioid Epidemic

42.    The past two decades have been characterized by increasing abuse and diversion of  prescription drugs, including opioid medications, in the United States.[3]

43.    Prescription opioids have become widely prescribed. By 2010, enough prescription opioids were sold to medicate every adult in the United States with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.[4]

44.    By 2011, the U.S. Department of Health and Human Resources, Centers for

---

[3] *See* Richard C. Dart et al, *Trends in Opioid Analgesic Abuse and Mortality in the United States*, 372 N. Eng. J.  Med. 241 (2015).

[4] Katherine M. Keyes at al., *Understanding the Rural-Urban Differences in Nonmedical Prescription Opioid Use  and Abuse in the United States*, 104 Am. J. Pub. Health e52 (2014).

Disease Control and Prevention, declared prescription painkiller overdoses at epidemic levels. The News Release noted:

  a.  The death toll from overdoses of prescription painkillers has more than tripled in the past decade.

  b.  More than 40 people die every day from overdoses involving narcotic pain relievers like hydrocodone (Vicodin), methadone, oxycodone (OxyContin), and oxymorphone (Opana).

  c.  Prescription drug abuse is a silent epidemic that is stealing thousands of lives and tearing apart communities and families across America.

  d.  Almost 5,500 people start to misuse prescription painkillers every day.[5]

45.    The number of annual opioid prescriptions written in the United States is now roughly equal to the number of adults in the population.[6]

46.    Many Americans are now addicted to prescription opioids, and the number of deaths due to prescription opioid overdose is unacceptable. In 2016, drug overdoses killed roughly 64,000 people in the United States, an increase of more than 22 percent over the 52,404 drug deaths recorded the previous year.[7]

47.    Moreover, the CDC has identified addiction to prescription pain medication as the strongest risk factor for heroin addiction. People who are addicted to prescription opioid painkillers are forty times more likely to be addicted to heroin.[8]

---

[5] *See* Press Release, Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Prescription Painkiller Overdoses at Epidemic Levels (Nov. 1, 2011), https://www.cdc.gov/media/releases/2011/p1101_flu_pain_killer_overdose.html.

[6] *See* Califf et al., *supra* note 3.

[7] *See* Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Provisional Counts of Drug Overdose Deaths, (August 8, 2016), https://www.cdc.gov/nchs/data/health_policy/monthly-drug-overdose-death-estimates.pdf.

[8] *See* Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., *Today's Heroin*

48.     Heroin is pharmacologically similar to prescription opioids. The majority of current heroin users report having used prescription opioids non-medically before they initiated heroin use. Available data indicates that the nonmedical use of prescription opioids is a strong risk factor for heroin use.[9]

49.     The CDC reports that drug overdose deaths involving heroin continued to climb sharply, with heroin overdoses more than tripling in 4 years. This increase mirrors large increases in heroin use across the country and has been shown to be closely tied to opioid pain reliever misuse and dependence. Past misuse of prescription opioids is the strongest risk factor for heroin initiation and use, specifically among persons who report past-year dependence or abuse. The increased availability of heroin, combined with its relatively low price (compared with diverted prescription opioids) and high purity appear to be major drivers of the upward trend in heroin use and overdose.[10]

50.     The societal costs of prescription drug abuse are "huge."[11]

51.     Across the nation, local governments are struggling with a pernicious, ever-expanding epidemic of opioid addiction and abuse. Every day, more than 90 Americans lose their lives after overdosing on opioids.[12]

---

*Epidemic*, https://www.cdc.gov/vitalsigns/heroin/index.html (last updated July 7, 2015).

[9] *See* Wilson M. Compton, *Relationship Between Nonmedical Prescription-Opioid Use and Heroin*, 374 N. Eng. J. Med. 154 (2016).

[10] *See* Rose A. Rudd et al., *Increases in Drug and Opioid Overdose Deaths—United States, 2000–2014*, 64 Morbidity & Mortality Wkly. Rep. 1378 (2016).

[11] *See* Amicus Curiae Brief of Healthcare Distribution Management Association in Support of Appellant Cardinal Health, Inc., *Cardinal Health, Inc. v. United States Dept. Justice*, No. 12-5061 (D.C. Cir. May 9, 2012), 2012 WL 1637016, at *10 [hereinafter Brief of HDMA].

[12] Opioid Crisis, NIH, National Institute on Drug Abuse (available at https://www.drugabuse.gov/drugs-abuse/opioids/opioid-crisis, last visited April 9, 2018) ("Opioid Crisis, NIH") (citing at note 1 Rudd RA,

52.    The National Institute on Drug Abuse identifies misuse and addiction to opioids as "a  serious national crisis that affects public health as well as social and economic welfare."[13] The economic burden of prescription opioid misuse alone is $78.5 billion a year, including  the costs of healthcare, lost productivity, addiction treatment, and criminal justice  expenditures.[14]

53.    The U.S. opioid epidemic is continuing, and drug overdose deaths nearly tripled during  1999–2014. Among 47,055 drug overdose deaths that occurred in 2014 in the United States, 28,647 (60.9%) involved an opioid.[15]

54.    The rate of death from opioid overdose has quadrupled during the past 15 years in  the  United States. Nonfatal opioid overdoses that require medical care in a hospital or emergency department have increased by a factor of six in the past 15 years.[16]

55.    Every day brings a new revelation regarding the depth of the opioid plague: just to name  one example, the New York Times reported in September 2017 that the epidemic, which now claims 60,000 lives a year, is now killing babies and toddlers because ubiquitous,  deadly opioids are "everywhere" and mistaken as candy.[17]

---

Seth P, David F, Scholl L. Increases in Drug and Opioid-Involved Overdose Deaths — United States, 2010–2015. MMWR Morb Mortal Wkly Rep 2016;65:1445–1452. DOI: http://dx.doi.org/10.15585/mmwr.mm655051e1)

[13] Opioid Crisis, NIH.

[14] *Id.* (citing at note 2 Florence CS, Zhou C, Luo F, Xu L, The Economic Burden of Prescription Opioid Overdose,  Abuse, and Dependence in the United States, 2013, *MED CARE* 2016;54(10):901-906, doi:10.1097/MLR.0000000000000625).

[15] *See* Rose A. Rudd et al., *Increases in Drug and Opioid-Involved Overdose Deaths—United States, 2010–2015*, 65  Morbidity & Mortality Wkly. Rep. 1445 (2016).

[16] *See* Volkow & McLellan, *supra* note 1.

[17] Julie Turkewitz, 'The Pills are Everywhere': How the Opioid Crisis Claims Its Youngest Victims, N.Y. Times,   Sept. 20, 2017 ("'It's a cancer,' said [grandmother of dead one-year old], of the nation's opioid problem, 'with tendrils that are going everywhere.'").

56.     The epidemic of prescription pain medication and heroin deaths is devastating families and  communities across the country.[18] Meanwhile, Defendants have helped the manufacturers and distributors of  prescription opioids extract billions of dollars of revenue from the addicted American  public while public entities experience tens of millions of dollars of injury caused by the  reasonably foreseeable consequences of the prescription opioid addiction epidemic.

57.     Defendants have  continued their wrongful, intentional, and unlawful conduct, despite their knowledge that  such conduct is causing and/or continuing to contribute to the national, state, and local opioid epidemic.

58.     The role of the opioid manufacturers, distributors and pharmacies in creating the opioid epidemic has been widely publicized and is widely known.  However, McKinsey's role in fueling the opioid epidemic has only recently been discovered.

**B.      The Corporate Integrity Agreement**

59.     In May of 2007, Purdue Frederick Company, the parent company of Purdue Pharma L.P. ("Purdue") pleaded guilty to charges for misleading regulators, doctors, and the public regarding Purdue's opioid OxyContin. In pleading guilty, Purdue admitted to falsely marketing OxyContin as a less addictive, safer alternative to other pain medications.

60.     In the global settlement resolution, Purdue and its parent company paid over $600 million and entered into a Corporate Integrity Agreement with the U.S. Department of Health and Human Services Office of Inspector General.

---

[18] *See* Presidential Memorandum – Addressing Prescription Drug Abuse and Heroin Use, 2015 Daily Comp. Pres.  Doc. 743 (Oct. 21, 2015), https://www.gpo.gov/fdsys/pkg/DCPD-201500743/pdf/DCPD-201500743.pdf.

61.    Under the Corporate Integrity Agreement, for five years, Purdue was required to refrain from making any deceptive or misleading claims about OxyContin and was obligated to submit regular compliance reports regarding its sales and marketing practices. Purdue was also required to monitor, report, and attempt to prevent inappropriate prescribing practices.

### C.    McKinsey's Role Following the Corporate Integrity Agreement

### 1.    The Sacklers Seek to Divert Money to Themselves

62.    Following the guilty plea, the Sackler family, who controlled Purdue at all relevant times and is one of the richest families in the United States, sought to insulate themselves from the risk they perceived in Purdue.

63.    Email threads between the Sacklers in early 2008 indicate that the Sacklers had become concerned about personal liability regarding opioid-related misconduct.

64.    The Sacklers considered selling Purdue or merging with another pharmaceutical company as an option for limiting their risk. Mortimer Sackler Jr. advocated for a sale or merger in a February 21, 2008 email to Dr. Richard Sackler (a former president and co-chairman of Purdue) and several others, writing "[t]he pharmaceutical industry has become far too volatile and risky for a family to hold 95% of its wealth in. It simply is not prudent for us to stay in the business given the future risks we are sure to face and the impact they will have on the shareholder value of the business and hence the family's wealth." The risk he referred to was, at least in significant part, further liability related to misconduct in the marketing and sale of OxyContin.

65.    Alternatively, the Sacklers considered extracting as much wealth as possible from Purdue through distributions to themselves as shareholders. Such distributions would allow the Sacklers to diversify their assets and make their wealth less vulnerable to judgments regarding Purdue's sales and marketing of opioids, including OxyContin.

66. Either option -- a sale or significant distributions to shareholders -- would require Purdue to increase profitability in the short term. Purdue turned to McKinsey, with which it had an existing business relationship, for help maximizing sales of OxyContin given the requirements of the Corporate Integrity Agreement and the scrutiny that came along with it.

## 2. McKinsey Supplied Purdue with Granular Sales and Marketing Strategies and Remained Intimately Involved in Implementation

67. McKinsey touts its model of engaging in transformational partnerships with its clients. Rather than giving one-off advice, McKinsey learns each client's business intimately and provides tailored, granular strategies.

68. McKinsey had begun collaborating with Purdue by June 2009. McKinsey was tasked with increasing OxyContin sales despite the Corporate Integrity Agreement, which required, among other things, that Purdue comport with FDA requirements and also included increased review and reporting obligations.

69. McKinsey provided sales and marketing strategies designed to sell as much OxyContin as possible, at one point in 2010 telling Purdue that the new strategies McKinsey had developed could generate as much as $400,000,000 in additional annual sales. McKinsey worked with Purdue to implement the strategies, with McKinsey's ongoing and extensive involvement.

70. OxyContin sales grew dramatically, and the Sacklers diverted the resulting profits into other holdings.

71. In a 2009 report, among other sales strategies, McKinsey advised Purdue sales representatives to push the highest dosages of OxyContin, which were the most profitable for Purdue. In order to maximize dosages and improve targeting of the coordinated marketing strategy, McKinsey investigated the prescribing habits of individual physicians.

72. McKinsey helped shape Purdue's OxyContin marketing, which misleadingly

centered on freedom and peace of mind for users. The marketing was tailored to avoid running directly afoul of the Corporate Integrity Agreement, but it remained misleading given what Purdue and McKinsey knew about opioids. One advertisement said, "we sell hope in a bottle," despite the fact that both McKinsey and Purdue already understood the addiction problems associated with opioid use and abuse.  McKinsey encouraged Purdue to tell doctors that OxyContin would give their patients "the best possible chance to live a full and active life."

73.     McKinsey urged Purdue to train and incentivize its sales representatives to increase sales across the market for opioids, even if sales went to Purdue's competitors. This was intended to serve the Sackler family's goal of increasing the marketability of Purdue for potential mergers, but it had the effect of worsening the opioid crisis even beyond the portion of the crisis directly attributable to sales and use of OxyContin.

**D.     Project Turbocharge**

74.     The Corporate Integrity Agreement expired in 2012.  With this restriction lifted, McKinsey devised additional marketing and sales strategies for Purdue to further increase OxyContin sales.

75.     In the second half of 2013, McKinsey made recommendations to Purdue to increase OxyContin revenue, including "Turbocharging Purdue's Sales Engine."

76.     McKinsey's "Project Turbocharge" recommendations included revising the existing process for targeting high-prescribing physicians, with a shift from targeting solely on the basis of prescription deciles to considering additional factors. Based on its analysis, McKinsey told Purdue that "[t]here is significant opportunity to slow the decline of OxyContin by calling on more high-value physicians" and that "[t]he revenue upside from sales re-targeting and adherence could be up to $250 million."

77.    Also, as part of the "Project Turbocharge" recommendations, McKinsey determined and advised Purdue that the top half of prescribing physicians "write on average 25 times more scripts per prescriber" than the lower half.

78.    Despite knowing the then recently expired Corporate Integrity Agreement required Purdue to refrain from improperly incentivizing OxyContin sales, McKinsey also recommended increasing incentive compensation for incremental OxyContin prescriptions, advising Purdue that "[r]evision to incentive comp could better align reps to Purdue's economics."

79.    At the same time, McKinsey recommended decreasing training by six days a year in order to allow employees more time to make sales calls. Meanwhile, McKinsey advised Purdue to exercise closer control over its sales staff in order to generate more efficient physician targeting.

80.    Physician targeting proved effective. McKinsey advised Purdue that visiting high-prescribing doctors many times per year increased sales.

81.    McKinsey recommended that Purdue circumvent pharmacies entirely with a mail order program because enforcement by federal regulators was decreasing OxyContin dispensing through Walgreens.

82.    At the board level, McKinsey urged the Sacklers to impose a "revenue growth goal" on management.

83.    With McKinsey's ongoing involvement and advice, Purdue implemented McKinsey's recommendations discussed above, but rebranded the program from Project Turbocharge to Evolve to Excellence.

84.    McKinsey's efforts had the effect the Sacklers had asked McKinsey to achieve. Sales of OxyContin tripled in the years following the 2007 guilty plea, despite the restrictions imposed by the Corporate Integrity Agreement. According to the U.S. Department of Justice,

"[f]rom 2010 to 2018, Purdue's profits were almost entirely driven by its success in selling OxyContin."

85.     The Sacklers did not sell Purdue or enter into a merger, but their goal of extracting wealth from the business was realized. The Sackler family has withdrawn over $10 billion from Purdue since 2008, including $1.7 billion in 2009 alone. These distributions were made possible by McKinsey's services and came at the expense of a deepening national opioid crisis.

E.    **McKinsey Knew About Dangers of Opioids and Acted to Maximize OxyContin Prescriptions Anyways**

86.     McKinsey has a long history of consulting in the pharmaceutical industry. In addition to its work with Purdue, McKinsey has performed "opioid-related work" for Johnson & Johnson, Endo International, and Mallinckrodt Pharmaceuticals. For instance, a McKinsey PowerPoint presentation prepared for Johnson & Johnson recommended that Johnson & Johnson aggressively target and influence doctors treating back pain in order to increase opioid sales.

87.     Purdue's 2007 guilty plea put McKinsey on notice of Purdue's misconduct. By that time, McKinsey had access to public information indicating that OxyContin and other opioids pose significant risk of addiction and misuse.

88.     McKinsey's presentations to Purdue in 2013 included extensive discussion of doctors' concerns about opioid misuse and side effects, demonstrating McKinsey's awareness of the dangers of opioids. Rather than working to limit these disastrous effects, McKinsey treated doctors' misgivings as obstacles to confront with new messaging.

89.     McKinsey continued working with Purdue long after the severity of the opioid crisis was well known. In 2017, McKinsey proposed that Purdue pay CVS and other distributors of OxyContin rebates "for every OxyContin overdose attributable to pills they sold."

90.     A former McKinsey consultant described McKinsey's work with Purdue as "the

banality of evil, M.B.A. edition...They knew what was going on. And they found a way to look past it, through it, around it, so as to answer the only questions they cared about: how to make the client money, and when the walls closed in, how to protect themselves."

91.    In a 2018 email thread, apparently fearing consequences for McKinsey's work with Purdue, two McKinsey senior partners who had participated in McKinsey's work advising Purdue discussed deleting documents related to opioids.

### F.    Purdue's 2020 Guilty Plea and McKinsey's Recent Statement

92.    In October of 2020, Purdue once again reached an agreement (the "2020 Settlement Agreement") with the U.S. Department of Justice to enter a guilty plea related to its marketing of OxyContin. The agreement includes $8.3 billion in penalties from Purdue and $225 million from the Sackler family.

93.    In the 2020 Settlement Agreement, Purdue pleaded guilty to defrauding health agencies, violating anti-kickback laws, paying illegal kickbacks to doctors, and "using aggressive marketing tactics to convince doctors to unnecessarily prescribe opioids--frivolous prescriptions that experts say helped fuel a drug addiction crisis that has ravaged America for decades."

94.    The 2020 Settlement Agreement was entered by Purdue and the United States government. It explicitly states that it does not release Purdue of "[a]ny liability for claims of the states or Indian tribes."

95.    The 2020 Settlement Agreement includes a provision specifically reserving claims regarding "[a]ny liability of entities other than the [Purdue Bankruptcy] Debtors, including consultants."

96.    On December 5, 2020, McKinsey issued the following statement regarding its work with Purdue:

*December 5, 2020*—As we look back at our client service during the opioid crisis, we recognize that we did not adequately acknowledge the epidemic unfolding in our communities or the terrible impact of opioid misuse and addiction on millions of families across the country. That is why last year we stopped doing any work on opioid-specific business, anywhere in the world.

Our work with Purdue was designed to support the legal prescription and use of opioids for patients with legitimate medical needs, and any suggestion that our work sought to increase overdoses or misuse and worsen a public health crisis is wrong. That said, we recognize that we have a responsibility to take into account the broader context and implications of the work that we do. Our work for Purdue fell short of that standard.

We have been undertaking a full review of the work in question, including into the 2018 email exchange which referenced potential deletion of documents. We continue to cooperate fully with the authorities investigating these matters.

97.    In recent weeks, McKinsey has settled opioid-related claims with 49 states, the District of Columbia, and five U.S. territories for approximately $600 Million Dollars.

**G.    Impact of Opioid Abuse, Addiction and Diversion**

98.    The State of Louisiana has been impacted severely by the national opioid crisis.

99.    Louisiana has an opioid prescription rate which ranks FIFTH in the country.

100.    As reported by the Centers for Disease Control and Prevention, Louisiana has been among the states hardest hit by the opioid epidemic for years. From 1999 to 2016, Louisiana's death rate due to drug overdose has increased exponentially.[19]

**VII.  CLASS ALLEGATIONS**

101.    Plaintiff brings this action pursuant to the provisions of Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure as a Class Action on their own behalf and on behalf of all other persons similarly situated.  This action satisfies the numerosity, commonality, typicality, predominance, and superiority requirements of Fed. R. Civ. P. 23(a) and 23(b)(3).

---

[19] Centers for Disease Control and Prevention (CDC) National Center for Health Statistics.

**A.     Class Definition**

102.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all members of the class who have been impacted by Defendants' actions and omissions as follows:

        a.     all Louisiana Parishes for the period of 2004 to the present ("County Class"); and

        b.     all Louisiana Cities, Towns and/or Municipalities for the period of 2004 to the present ("Municipality Class").

103.    Plaintiff reserves the right to amend or modify the Class definitions with greater specificity where and as necessary, including to conform to the evidence, for purposes of resolution or settlement.

**B.     Class Requirements**

104.    The putative classes are sufficiently numerous – 64 Parishes and approximately 308 Municipalities -- that joinder of each absent Class Member would be both impracticable and inefficient.

105.    There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

        a.     Defendants' conduct in creating, proposing, and implementing sales and marketing strategies for opioids manufactured by Purdue before and after Purdue's first guilty plea in 2007 relating to misbranding of OxyContin;

        b.     Whether Defendants performed reasonable due diligence in ascertaining the risks associated with Defendants' strategies for "turbocharging" OxyContin sales at Purdue

in 2013 and thereafter;

c.    Whether Defendants' implementation of its own sales and marketing strategies for its client, Purdue, caused or contributed to an increase in opioid addiction;

d.    Whether Defendants' conduct with respect to developing and implementing nationwide opioid sales and marketing practices at Purdue was negligent, grossly negligent, or reckless;

e.    Whether Defendants' conduct with respect to developing and implementing nationwide opioid sales and marketing practices at Purdue caused or contributed to causing a public nuisance;

f.    Whether Defendants' conduct with respect to developing and implementing nationwide opioid sales and marketing practices at Purdue constituted fraudulent misrepresentations to healthcare providers regarding the safety of Purdue's opioid products;

g.    Whether Defendants conspired with or aided and abetted Purdue with respect to developing and implementing nationwide opioid sales and marketing practices at Purdue; and

h.    Whether Defendants' acceptance of funds from Purdue and other opioid manufacturers regarding Defendants' work promulgating and implementing nationwide opioid sales and marketing strategies constitutes unjust enrichment.

106.    Plaintiff's claims are typical to the claims of the Class. Plaintiff and all Class Members were exposed to undeviating behavior and sustained damages arising out of and caused by Defendants' unlawful conduct.

107.    Plaintiff's interest is directly aligned with the absent Class Members and, as such,

Plaintiffs will fairly and adequately represent and protect the interests of the absent Class Members. Plaintiff has retained counsel experienced in the prosecution of class action litigation who will adequately represent the interests of the putative class. Further, Plaintiff is unaware of any conflicts between Plaintiff and the absent Class Members.

108.    Plaintiff has, or can acquire as necessary, sufficient financial and legal resources to assure that the interests of the Class Members will be protected. Further, Plaintiff is knowledgeable concerning the subject matter of this action and have, and will, assist class counsel as necessary in the prosecution of this matter.

109.    The prosecution of Plaintiff's claim on an *ad hoc* basis would create a substantial risk of inconsistent and/or varying legal outcomes that would establish incompatible standards of conduct. Class certification would alleviate these issues and provide for an orderly, timely, and efficient resolution for each Class Member as well as the Court.

110.    The prosecution of Plaintiff's class claims on an individual *ad hoc* basis is inappropriate where Defendants have admittedly acted in such a manner that final declaratory and injunctive relief is both necessary and required. Similarly, *ad hoc* litigation is inappropriate where declaratory and injunctive relief is warranted to the Class Members as whole.

111.    Given the putative class is comprised solely of Louisiana Parishes and Municipalities, the class action procedural mechanism is appropriate and provides a superior means of resolution.

## VIII.  CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

112.    McKinsey, through its work with Purdue, owed a duty to use reasonable care to prevent causing harm to the Plaintiff and the Class resulting from pursuant encouraging the over-marketing and over-prescribing of a controlled substance known at the time to be addictive and known at the time to be a threat to public health in the State of Louisiana and particularly in the Plaintiff Communities.

113.    In violation of this duty, for years McKinsey devised and assisted Purdue with implementing a sales and marketing campaign, including *Project Turbocharge*, that would dramatically increase the amount of OxyContin prescribed and distributed throughout Plaintiff's and the Class' communities.  In the process, McKinsey continually devised misleading claims regarding OxyContin as part of their efforts to get health care providers to write more and more OxyContin prescriptions.

114.    As a direct and proximate result of McKinsey's conduct, the Plaintiff and the Class have been damaged, and will continue to be damaged, and seek all legal and equitable relief as allowed by law, including, *inter alia*, actual damages, compensatory damages, punitive damages, treble damages, equitable relief, forfeiture as deemed proper by the Court, attorneys' fees and all costs and expenses of suit and pre- and post-judgment interest.

## COUNT II
## FRAUD AND MISREPRESENTATION

115.    McKinsey, in the course of its business with Purdue, has committed misrepresentation, deceit, concealment and fraud through:

- the willful, reckless or mistaken representations of materials facts;

- the suppression of material facts that Defendants were under a duty to communicate;

- the concealment of material facts with the intent to deceive and mislead;

- the misrepresentation of material facts made willfully to induce actions to the Plaintiff's detriment; and

- the intentional misrepresentation of material facts with knowledge of the falsity of the representations with intent the Plaintiff would rely on the representations to their detriment.

116.    In an effort to mislead the public concerning risks, benefits and safety of prescription opioids, the Defendants worked both individually and in concert to deceptively market and falsely present Purdue's products.

117.    McKinsey, in the course of its business with Purdue, failed to exercise reasonable care or competence when obtaining and communicating false information regarding Purdue's opioids that McKinsey knew would be used for the guidance of others in their business transactions, including the healthcare providers within Plaintiff's and the Class Member's communities who were capable of prescribing Purdue's drugs.

118.    Plaintiff's and the Class' communities are among the limited group of entities to whom McKinsey knew Purdue intended to supply the false information regarding opioids.

119.    McKinsey knew that the false information was material to healthcare providers' decision to prescribe opioids to patients. McKinsey intended that such statements be relied upon to encourage additional opioid prescriptions.

120.    McKinsey made and caused to be made false representations to healthcare providers working in Plaintiff's and the Class' communities, and/or omitted material facts, regarding the risks, efficacy, and medical necessity of opioids, generally, and Purdue's opioids, specifically. McKinsey knew these representations were false, made recklessly without knowledge of the truth, and/or had no reasonable ground for believing such assertions. Specifically, McKinsey knowingly and/or recklessly:

a. downplayed the substantial risks of addiction and other side-effects of opioids, generally, and Purdue's opioids, specifically, including crafting Purdue's marketing plan to affirmatively state in sales calls and other marketing channels that Purdue's drugs were not as addictive or prone to abuse as they truly are; stating that classic signs of addiction were actually an indication of "pseudoaddiction" requiring additional administration of opioids, and omitting the high risks of addiction actually present;

b. overstated the efficacy of opioids, generally, and Purdue's opioids, specifically, including making false statements regarding the effectiveness of the drugs for treating specific subsets of the patient population (i.e., those with osteoarthritis) and their ability to improve patient function; and

c. misrepresented the medical usefulness and necessity of opioids, generally, and Purdue's opioids, specifically, including affirmatively marketing their drugs for off label uses (i.e., osteoarthritis) without solicitation and not in response to questions from healthcare providers.

121.   McKinsey and Purdue's misrepresentations and omissions had a tendency to deceive others, to violate public confidence, and/or injure public interests. McKinsey, having chosen to craft the marketing plan used by Purdue to make representations to healthcare providers regarding their opioids, were under a duty to disclose the whole truth, and not disclose partial and misleading truths.

122.   McKinsey intended healthcare providers to rely upon McKinsey's false assertions regarding the risks, efficacy, and medical necessity of opioids, generally, and Purdue's opioids, specifically, to increase the number of opioid prescriptions made by healthcare providers.

123.     Healthcare providers working in Plaintiff's and the Class' communities did in fact rely on the false representations made in Purdue's marketing plan created by McKinsey and implemented with McKinsey's assistance.

124.     McKinsey acted with knowledge and willful intent, with reckless disregard for the rights of others, and/or intentionally and with malice towards others. As such, Plaintiff and the Class seek to recover punitive damages against McKinsey.

125.     As a proximate result of McKinsey's conduct, Plaintiff and the Class have incurred excessive costs related to the diagnosis, treatment, and cure of addiction or risk of addiction to opioids.  Plaintiff and the Class have borne the massive costs of these illnesses and conditions by having to provide necessary resources for care, treatment facilities, law enforcement services, and to allocate limited resources to combat the devasting social effects of the opioid epidemic.

126.     Defendants' fraud and misrepresentation has exacted a financial burden for which the Plaintiff seeks relief and damages.  Plaintiff and the Class seek to recover all damages caused by McKinsey's fraudulent representations and omissions.

127.     As a proximate result of the Defendants' conduct, the Plaintiff has been damaged, and will continue to be damaged, and seek all legal and equitable relief as allowed by law, including, *inter alia*, actual damages, compensatory damages, punitive damages, treble damages, equitable relief, forfeiture as deemed proper by the Court, attorneys' fees and all costs and expenses of suit and pre- and post-judgment interest.

## COUNT III
## PUBLIC NUISANCE

128.     Plaintiff brings this claim against McKinsey under Louisiana law which confers upon Plaintiff counties the power to suppress all nuisances that are or may be injurious to the health and welfare of their respective communities.  Plaintiff further seeks to recover costs associated

with the nuisance and its abatement.

129.    Louisiana has found that a prohibited activity under its public nuisance statutes can include the illegal manufacture, sale or distribution of, or possession with intent to manufacture, sell, or distribute, a controlled dangerous substance, which include opiates.  Plaintiff has the right and the power to suppress nuisances.

130.    The Defendants are liable for public nuisance because its conduct at issue has caused an unreasonable and substantial interference with a right common to the general public, which is the proximate cause of, and/or substantial factor leading to, Plaintiff's injuries.

131.    McKinsey has created and continues to perpetuate and maintain a public nuisance throughout the Plaintiff's and the Class's communities through the massive distribution of millions of doses of highly addictive, commonly abused prescription pain killers known as opioids and a campaign of false information regarding opioids.

132.    Defendants engaged in conduct or omissions which endanger or injure the property, health, safety, and comfort of the persons in the Plaintiff's and the Class's communities. This conduct consisted of, but is not limited to, the production, promotion, and marketing of opioids for use by the residents of the Plaintiff's and the Class's communities.

133.    Defendants' actions have caused considerable hurt, inconvenience, and damage to all members of the public.

134.    Defendants' conduct is not only unlawful but has also resulted in substantial and unreasonable interference with public health and safety.

135.    Defendants' conduct is not insubstantial or fleeting. Defendants' conduct has so severely impacted public health on every geographic and demographic level that the public nuisance perpetrated by this conduct is commonly referred to as the opioid "crisis" or "epidemic."

136.    McKinsey's actions have caused deaths, serious injuries, and a severe disruption of public peace, order, and safety; it is ongoing, and it is producing permanent and long-lasting damage. The harm caused by Defendants' conduct is not fanciful, or such as would affect only one of fastidious taste. Rather, Defendants' conduct is such that it affects numerous ordinary, reasonable persons.

137.    McKinsey's conduct, including its misrepresentations and omissions regarding opioids, generally, and Purdue's opioids, specifically, have fueled an opioid epidemic within the Plaintiffs' and the Class's communities that constitutes a public nuisance. McKinsey and Purdue knowingly exacerbated a condition that affects entire municipalities, towns, and communities. McKinsey's annoyance, injury, and danger to the comfort, repose, health, and safety of Plaintiff's and the Class's communities includes, inter alia:

a.    The high rates of use leading to unnecessary opioid abuse, addiction, overdose, injuries, and deaths;

b.    Even children have fallen victim to the opioid epidemic.  Easy access to prescription opioids made opioids a recreational drug of choice among teenagers. Even infants have been born addicted to opioids due to prenatal exposure, causing sever withdrawal symptoms and lasting developmental impacts;

c.    Even those residents of the Parish and Plaintiff's Community who have never taken opioids have suffered from the public nuisance arising from Defendants' abdication of their gatekeeper duties and fraudulent promotions.  Many residents have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed

by opioids.;

d.  The opioid epidemic has increased health care costs;

e.  The diversion of opioids into the secondary, criminal market and the increased numbers of individuals who abuse or are addicted to opioids increased the demands on health care services and law enforcement;

f.  The significant and unreasonable interference with the public rights caused by Defendants' conduct taxed the human, medical, public health, law enforcement, and financial resources of the Plaintiff and Plaintiff's Community;

g.  prescription opioid addiction often leads to illicit opioid use and addition;

h.   according to the Centers for Disease Control, past misuse of prescription opioids is the strongest risk factor for heroin initiation and use;

i.  Louisiana's hospitals are reporting increasing numbers of newborns testing positive for prescription medications;

j.  McKinsey's crafted deceptive marketing strategies that were prepared for Purdue, purchased by Purdue, and implemented by Purdue with McKinsey's ongoing assistance. These strategies enflamed, purposefully, an opioid abuse and addiction epidemic that has caused Plaintiff's and the Class's communities to bear enormous social and economic costs including increased health care, criminal justice, and lost work productivity expenses, among others;

k.  Employers have lost the value of productive and health employees;

l.  Defendants' conduct created and abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury; and

m.  Defendants' dereliction of duties and/or fraudulent misinformation campaign

pushing dangerous drugs resulted in a diverted supply of narcotics to sell, and the ensuing demand of addicts to buy them.  More prescription opioids sold by Defendants led to more addiction, with many addicts turning from prescription opioids to heroin.  People addicted to opioids frequently require increasing levels of opioids, and many turned to heroin as a foreseeable result.

138.    McKinsey's actions have created a public nuisance.

139.    The public nuisance created by McKinsey is within control of McKinsey.

140.    The public nuisance created by Defendants are the result of repeated and continuing conduct which requires the expenditure of funds by Plaintiff on an ongoing and continuous basis.

141.    Defendants caused a significant and unreasonable interference with the public health, safety, welfare, peace, comfort and convenience, and ability to be free from disturbance and reasonable apprehension of danger to person or property.

142.    Defendants' actions have been of a continuing nature and have produced a significant effect upon the public's rights, including the public's right to health and safety.

143.    Defendants' ongoing conduct produces an ongoing nuisance, as the prescription opioids that their deceptive business practices cause to be distributed and possessed have and will continue to lead to abuse, addiction, crime, and public health costs.

144.    Because of the continued use and addiction, the public will continue to fear for its health, safety and welfare, and will be  subjected to conduct that creates a disturbance and reasonable apprehension of danger to  person and property.

145.    Defendants knew or reasonably should have known that their conduct will have an  ongoing detrimental effect upon the public health, safety and welfare, and the public's ability to be free from disturbance and reasonable apprehension of danger to person and  property.

146.    Defendants knew or reasonably should have known that their conduct causes an unreasonable invasion of the public right to health, safety and welfare and the public's ability to be free from disturbance and reasonable apprehension of danger to person and property.

147.    Defendants' conduct in marketing and selling prescription opioids,  which the Defendants knew or reasonably should have known will likely cause addiction, abuse, and subsequent negative effects, is reasonably foreseeable and creates a strong likelihood that these illegal distributions of  opioids will cause death and injuries and otherwise  significantly and unreasonably interfere with public health, safety and welfare, and with  the public's right to be free from disturbance and reasonable apprehension of danger to  person and property.

148.    Defendants' actions were, at the least, a substantial factor in opioids becoming widely available and widely used for non-medical purposes.

149.    The consequence of prescription opioid abuse directly and proximately results in significant costs to the Plaintiff and the Class in order to enforce the law, treat the victims of opioid abuse and  addiction, and to otherwise care for communities ravaged by this epidemic.

150.    Defendants' conduct is a direct and proximate cause of deaths and injuries to the residents of Louisiana, and a significant and unreasonable interference with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger  to person and property.

151.    Defendants' deceptive and illegal business practices constitute a public nuisance and, if unabated, will continue  to threaten the health, safety and welfare of the residents of Louisiana creating  an atmosphere of fear and addiction that tears at the residents' sense of well-being and  security. Plaintiff has a clearly ascertainable right to abate conduct that perpetuates this  nuisance.

152.     Defendants acted recklessly, negligently and/or carelessly, thereby creating an unreasonable risk of harm.

153.     Defendants acted with actual malice because Defendant acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

154.     The damages available to the Plaintiff and the Class include, *inter alia*, recoupment of governmental costs, flowing from an ongoing and persistent public nuisance which the government seeks to abate. Defendants' conduct is ongoing and persistent, and the Plaintiff and the Class seek all damages flowing from Defendant's conduct.

155.     Plaintiff and the Class seek to abate the nuisance and harm created by Defendants' conduct.

156.     As a direct result of Defendants' conduct, the Plaintiff and the Class have suffered actual injury and damages including, but not limited to, significant expenses for police, emergency, health, prosecution, corrections and other services.

157.     The Plaintiff and the Class have sustained specific and special injuries because its damages include, inter alia, health services, law enforcement expenditures, and costs related to opioid addiction treatment and overdose prevention.

158.     The Plaintiff and the Class further seek to abate the nuisance created by the Defendants' unreasonable, unlawful, intentional, ongoing, continuing, and persistent actions and omissions and interference with a right common to the public.

159.     Plaintiff and the Class seek all legal and equitable relief as allowed by law, including inter alia abatement, compensatory damages, and punitive damages from the Defendants for the creation of a public nuisance, attorney fees and costs, and pre- and post-

judgment interest.

160.    The staggering rates of opioid and heroin use  resulting from the Defendants'
actions have caused harm to the entire community that includes, but is not limited to:

    a.    the high rates of use leading to unnecessary opioid abuse, addiction, overdose, injuries, and deaths;

    b.    recreational opioid use among teenagers;

    c.    infants have been born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts;

    d.    residents have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids;

    e.    the opioid epidemic has increased health care costs;

    f.    employers have lost the value of productive and healthy employees;

    g.    Defendants' conduct created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury;

    h.    increase in prescription opioids sold led to more addiction, with many addicts turning from prescription opioids to heroin. People addicted to opioids frequently require increasing levels of opioids, and many turned to heroin as a foreseeable result;

    i.    the diversion of opioids into the secondary, criminal market and the increased number of individuals who abuse or are addicted to opioids increased the demands on health care services and law enforcement;

    j.    taxed the human, medical, public health, law enforcement, and financial resources of Plaintiff and the Class; and

    k.    Defendants' interference with the comfortable enjoyment of life in the Plaintiff's and the Class's community is unreasonable because there is little social utility to opioid diversion and abuse, and any potential value is outweighed by the gravity of the harm inflicted by Defendants' actions.

161.    The harm is not outweighed by any utility of the Defendants' behavior. There is no
legitimate interest in the spreading of false information regarding a known addictive drug.

162.    Plaintiff seeks all legal and equitable relief as allowed by law , including *inter alia* injunctive relief, restitution, disgorgement   of profits, compensatory and punitive damages, and all damages allowed by law to be paid  by the Defendants, attorney fees and costs, and pre- and post-judgment interest.

163.    Plaintiff and the Class seek to abate the public nuisance McKinsey enflamed and all necessary relief to abate such public nuisance.

## COUNT IV
## CIVIL CONSPIRACY

164.    Louisiana law recognizes a civil conspiracy cause of action where multiple parties act in concert to commit wrongful acts.  The Defendants have in the past, and continue through the present, to work in a concerted effort to profit from the sale of prescription opioid drugs through violations of their statutory duties under the Controlled Substances Act, 21 U.S.C. § 801(2), 21 U.S.C. § 821-824 and 21 U.S.C. § 823(6)(1).

165.    McKinsey and Purdue, working together for decades, agreed to commit numerous unlawful acts relating to the sales and marketing of Purdue's opioid products. McKinsey and Purdue also agreed to use unlawful means to commit lawful acts as part of these sales and marketing efforts.

166.    McKinsey and Purdue agreed to pursue the unlawful act of knowingly misrepresenting the addictive nature of opioids in marketing OxyContin to health care providers within Plaintiff's and the Class' communities.

167.    McKinsey and Purdue deployed the unlawful means of evading Purdue's reporting and compliance obligations to the Inspector General of the United States Department of Health and Human Services for the five years Purdue was subject to a Corporate Integrity Agreement

after it pled guilty in 2007 to criminal misbranding. McKinsey assisted Purdue with evading these compliance obligations to accomplish the lawful act of maximizing OxyContin revenue to Purdue.

168.    McKinsey and Purdue conspired to violate Louisiana law, including but not limited to Louisiana's opioid marketing, sales, and distribution requirements as well as Louisiana's consumer protection laws.

169.    McKinsey and Purdue engaged in deceptive trade practices including making and causing to be made misrepresentations and omissions in marketing of opioids in general, and Purdue's opioids, specifically, that deceived or could reasonably be expected to deceive or mislead consumers.

170.    McKinsey and Purdue engaged in unfair trade practices, including intentionally downplaying of the risks, overstating the benefits, and misrepresenting the medical necessity of opioids, generally, and Purdue's opioids, specifically, including for off-label uses. These practices offend established public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

171.    As a result of McKinsey's conspiratorial activities, the sales volume of prescription opioids increased dramatically, along with revenues, with a corresponding increase of illegitimate, improper and illegal prescription opioids being distributed to the public

172.    McKinsey knowingly made or caused to be made false or misleading representations as to the characteristics, ingredients, uses, and benefits of opioids, generally, and Purdue's opioids, specifically, by downplaying the risks of addiction and abuse, overstating the efficacy, and misrepresenting the medical necessity of opioids, generally, and Purdue's opioids, specifically.

173.    McKinsey, a majority of the Purdue board, and Purdue agreed to deploy unlawful sales and marketing tactics to achieve the lawful purpose of maximizing revenue of a closely held company.

174.    As a consequence, McKinsey is responsible, liable, and accountable for the improper sales and marketing practices used to promote Purdue's opioid products including OxyContin.

175.    Defendants' conspiracy has exacted a financial burden for which the Plaintiff seek relief and damages.  As a proximate result of the Defendants' conduct, the Plaintiff has been damaged, and will continue to be damaged, and seek all legal and equitable relief as allowed by law, including, *inter alia*, actual damages, compensatory damages, punitive damages, treble damages, equitable relief, forfeiture as deemed proper by the Court, attorneys' fees and all costs and expenses of suit and pre- and post-judgment interest.

<u>**COUNT V**</u>
**WANTON-INTENTIONAL CONDUCT**

176.    The Defendants' actions, separately and severally, are the product of their conscious disregard of the rights and safety of the citizens of Plaintiff's and the Class' communities, with the attendant awareness that harm will (and has) likely result from the Defendants' actions.

177.    The Defendants' actions, separately and severally, are the product of their conscious disregard of the rights and safety of the citizens of Plaintiff's and the Class' communities, with the attendant awareness that harm will (and has) likely result from the Defendants' actions.

178.    The actions of the Defendants are set forth in the preceding counts and paragraphs of this Complaint and are incorporated herein by reference.  The Defendants' actions are willful,

wanton, intentional and committed with reckless disregard for the rights and safety of the citizens of Plaintiffs' and the Class' communities.

179.    The conduct of the Defendants has been, and continues to be, willful as defined by Louisiana law such that Defendants were aware that their actions, as well as their failure to act in stopping and preventing improper opioid distribution, would cause harm to the public.

180.    While the Defendants may not have intended harm to the specific named Plaintiff's and the Class' communities in this case, the Defendants knew their breach of their legal duties would cause great harm to the American public and Louisianians in particular yet they proceeded in their efforts to distribute and sell prescription opioids in disregard of the rights and safety of the citizens of Plaintiff's and the Class' communities.

181.    The actions of the Defendants, separately and severally, have combined and concurred to harm Plaintiff's and the Class' communities, and the actions of the Defendants have all contributed to cause the Plaintiff's and the Class' damages.

182.    The actions of the Defendants have, and continue to be, carried on with a reckless and/or conscious disregard for the rights, welfare and safety of the citizens of Plaintiff's and the Class' communities.

183.    The actions of the Defendants have, and continue to be, the source of unjust hardship to the citizens of Plaintiff's and the Class' communities.

184.    The actions of the Defendants have, and continue to be, wrongful actions without just cause or excuse.

185.    The Plaintiff and the Class demand judgment from the Defendants in an amount of money sufficient to punish the Defendants for their wrongful conduct and to protect the public by

deterring and discouraging the Defendants and others from doing the same or similar wrongs in the future.

## COUNT VI
## FALSE ADVERTISING

186.    Louisiana Revised Statute § 40:625(A) states that "An advertisement of a …drug…is false if it is false or misleading in any particular regarding the…drug…Any representation concerning any effect of a drug…is false under this Sub-section if it is not supported by demonstrable scientific facts of substantial and reliable medical or scientific opinion."

187.    "Advertisement" includes all representations of fact or opinion disseminated to the public in any manner, or by any means other than labelling. La. R.S. § 40:601.

188.    Defendants violated La. R.S. § 40:625, because they engaged in false advertising in the conduct of a business, trade, or commerce in this state.

189.    At all times relevant to this Petition, Defendants, directly, through their control of third parties, and by aiding and abetting third parties, violated La. R.S. § 40:625 by making and disseminating untrue, false, and misleading advertisements to Louisiana consumers to promote the sale and use of opioids to treat chronic pain, and by causing untrue, false, and misleading advertisements about opioids to be made or disseminated to Louisiana consumers in order to promote the sale and use of opioids to treat chronic pain.  The untrue, false, and misleading statements in advertisements and other patient brochures included, but were not limited to:

a.    Misrepresenting the truth about how opioids lead to addition;

b.    Misrepresenting that opioids improve function;

c.    Misrepresenting that addiction risk can be managed;

d.    Misleading patients through the use of misleading terms like "pseudoaddiciton";

e.    Falsely claiming that withdrawal is simply managed;

     f.   Misrepresenting that increased doses pose no significant addiction risks; and

     g.   Falsely omitting or minimizing the adverse effects of opioids and overstating the risks of alternative forms of pain treatment.

190.    At all times relevant to this Petition, Defendants, directly, through their control of third parties, and by aiding and abetting third parties, also violated La. R.S. § 40:625 through misleading advertisements in various marketing channels, including but not limited to: advertisements, brochures, and other patient educational materials that omitted or concealed material facts to promote the sale and use of opioids to treat chronic pain.  Defendants and their their-party allies repeatedly failed to disclose or minimized material facts about the risks of opioids, including the risk of addiction, and their risks compared to alternative treatments.  Such material omissions were deceptive and misleading in their own right, and further rendered even otherwise truthful statements about opioids untrue, false, and misleading, creating a misleading impression of the risks, benefits, and superiority of opioids for treatment of chronic pain.

191.    Defendants knew at the time of making or disseminating these misstatements and material omissions, or causing these misstatements and material omissions statement to be made or disseminated, that they were untrue, false, or misleading and therefore likely to deceive the public.  In addition, Defendants knew or should have known that their marketing and promotional efforts created an untrue, false, and misleading impression of the risks, benefits, and superiority or opioids.

192.    In sum, Defendants: (a) directly engaged in untrue, false, and misleading advertising; (b) disseminated the untrue, false, and misleading advertisements through third parties; and (c) aided and abetted the untrue, false, and misleading advertising by third parties.

193.    All of this conduct, separately and collectively, was intended to deceive Louisiana consumers who used or paid for opioids for chronic pain and Louisiana payors, including Plaintiff, who purchased, or covered the purchase of, opioids for chronic pain; and the political subdivisions of the state charged with maintaining law and order in the parishes who bore increased costs associated with foreseeable criminal activity arising from the rise in addition that was a direct consequence of Defendants' promotions of misleading advertisements about opioid risks and benefits.

194.    By reason of the foregoing, Plaintiff was injured and continues to be injured in that Defendants' false advertisements that caused consumers to request, doctors to prescribe, and payors such as Plaintiff to pay for long-term opioid treatment and using opioids manufactured or distributed by Defendants and other drug makers that they would not have otherwise paid for were it not for Defendants' false advertising.  But for Defendants' false advertising, Plaintiff would not have incurred increased law enforcement and social services costs associated with addition and criminal activity directly attributable to Defendants' misconduct.  Defendants caused and are responsible for those costs and claims.  Plaintiff has been injured by reason of Defendants' violation of La. R.S. § 40:625.

195.    Plaintiff respectfully requests that this Court enter an order (a) awarding judgment in favor of Plaintiff and against Defendants on Count VI of the Petition; (b) awarding Plaintiff his actual or compensatory damages; (c) awarding Plaintiff such other, further, and different relief as this Honorable Court may deem just.

## COUNT VII
## LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECITON LAW

196.    Plaintiff bring this count under the Louisiana Unfair Trade Practices Act ("LUTPA"), La. Rev. Stat. Ann. §§ 51:1401 *et. seq.* as Plaintiff are a "legal entity" and therefore

a "person" under the definitions of the LUTPA.  See La. Rev. Stat. Ann. § 51:1402(8).  Section 51:1409(A) allows any person who suffers any ascertainable loss of money or property "as a result of the use of employment by another person of unfair or deceptive method, act, or practice declared unlawful by R.S. 51:1405" to bring an action to recover actual damages.

197.    Under the LUTPA, "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  La. Rev. Stat. Ann. § 51:1405.

198.    Defendants committed repeated and willful unfair or deceptive acts or practices in the conduct of commerce.

199.    Defendants failed to report and/or prevent the diversion of highly addictive prescription drugs to illegal sources.

200.    Because of the dangerously addictive nature of these drugs, Defendants' marketing, sales, and/or distribution practices unlawfully caused an opioid and heroin plague and epidemic in the State, City and Plaintiff's Community.  Defendants had a non-delegable duty to guard against and prevent the diversion of prescription opioids to other than legitimate medical, scientific, and industrial channels.

201.    Defendants failed to disclose the material facts that *inter alia* they were not in compliance with laws and regulations requiring that they maintain a system to prevent diversion, protect against addition and severe harm, and specifically monitor, investigate, report, and refuse excessive or unusual orders.  But for these material factual omissions, Defendants would not have been able to sell opioids, Defendants would not have been able to receive and renew licenses to sell opioids.

202.    As evidenced by the conduct detailed above, Defendants' deceptive trade practices specifically include, but are not necessarily limited to, the following:

a.     The practice of monitoring for excessive or unusual orders of prescription opioids;

b.     The practice of not detecting excessive or unusual orders of prescription opioids;

c.     The practice of not investigating excessive or unusual orders of prescription opioids;

d.     The practice of filling, or failing to refuse fulfillment of, excessive or unusual orders of prescription opioids;

e.     The practice of not reporting excessive or unusual orders of prescription opioids;

f.     The practice of rewarding increases in prescription opioid sales; and/or

g.     The practice of falsely misrepresenting to the public that Defendants were complying with their legal obligations.

203.     Defendants' unfair, deceptive, and unconscionable representations, concealments, and omissions were reasonably calculated to deceive the public, Plaintiff's Community, and Plaintiff.

304.     As described more specifically above, Defendants' representations, concealments, and omissions constitute a willful course of conduct which continues to this day.

305.     The damages which Plaintiff seeks to recover were sustained as a direct and proximate cause of Defendants' intentional and/or unlawful actions and omissions.

306.     Defendants' actions and omissions in the course of marketing, selling, and distributing prescription opioids constitute deceptive trade practices under the LUTPA.

306.     State law prohibits representing that goods or services have sponsorship, approval, characteristics, uses, or benefits that they do not have.  State law further prohibits representing that goods are of standard, quality, or grade if they are of another.

307.    Defendants' egregiously, knowingly, willfully and/or unlawfully engaged in the deceptive trade practices described herein.

308.    Defendants' actions offend established public policy.

309.    Defendants' actions were unethical, unscrupulous and substantially injured consumers, Plaintiff and Plaintiff's Community.

310.    Defendants' unfair practices, as described above, offend deep-seated public policies under Louisiana law, *e.g.* 46 La. Admin Code. Pt XCI, § 313; *see also* La. Rev. Stat. Ann. § 40:974(A)(1) & (A)(4)), to maintain effective controls against diversion and to monitor, detect, investigate, refuse to fill, and report excessive or unusual orders of prescription opioids originating from the State, City, and Plaintiff's Community as well as those orders which Defendants knew or should have known were likely to be diverted into the State, City, and Plaintiff's Community. Nevertheless, by engaging in the conduct alleged above, Defendants actively worked to conceal the risk of addition related to opioids from Louisiana patients and prescribers in the hopes of selling greater quantities of their dangerous drugs.  Defendants also worked to undermine public policy, enshrined by regulations contained in law, that are aimed at ensuring honest marketing and safe and appropriate use of pharmaceutical drugs.

311.    Plaintiff has been damages, and is likely to be further damaged in the future, by the deceptive trade practices described herein.

312.    Defendants' egregiously, knowingly and willfully engaged in the deceptive trade practices described herein.

313.    Section 51:1409(A) of the LUTPA empowers this Court to grant treble damages, as well as costs and attorneys' fees against Defendants, if the Court finds that Defendants knowingly engages in an unfair or deceptive trade practice.

314.    Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' deceptive trade practices.  Plaintiff does not seek damages for physical personal injury or any physical damage to property caused by the Defendants' actions.

315.    Plaintiff seeks all legal and equitable relief as allowed by law, other than such damages disavowed herein, including *inter alia* restitution, disgorgement of profits, compensatory damages, treble damages, attorney fees and costs, and pre- and post-judgment interest.

## COUNT VIII
## RELIEF REQUESTED

WHEREFORE, in consideration of the claims stated above, the Plaintiff in this case respectfully submits that upon a full hearing of the evidence that this Honorable Court, and the jury hearing this case, grant the following relief:

316.    Judgment in favor of the Plaintiff against each Defendant separately and severally, based on joint and several liability, against each and every Defendant in this case;

317.    An entry of equitable relief and Order of Abatement against the Defendants, jointly and severally, along with all those acting in concert with the Defendants including all agents, subsidiaries and all other persons acting in concert or participation with the Defendants from continuing the conduct made the subject of this Complaint;

318.    An Order of Injunction against the Defendants on a permanent basis along with accompanying restitution;

319.    An Order from this Court against the Defendants that they fully compensate Plaintiffs for past and future expenses required to abate the nuisance caused by the opioid epidemic;

320.    A judgement and award of compensatory damages, including without limitation, all damages previously outlined in this Complaint;

321.    An award of pre-judgment and post-judgment interests;

322.    In addition to the damages outlined herein, Plaintiff demands that Defendants pay court costs, including attorneys' fees, applicable interest and all other relief as allowed under Louisiana law and as this Court deems appropriate and just; and

323.    Such other and further relief as the Court deems just and appropriate.

**PLAINTIFF DEMANDS TRIAL BY JURY**

Respectfully submitted,

By: */s/ D. Blayne Honeycutt*
D. Blayne Honeycutt (#18264)
Hannah Honeycutt Calandro (#37731)
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, La 70726
Phone:  (225) 664-0304
Email:  dbhoneycutt@fayardlaw.com

And

Frank C. Dudenhefer, Jr. (#0517)
THE DUDENHEFER LAW FIRM, L.L.C.
2721 St. Charles Avenue, Suite 2A
New Orleans, LA 70115
Phone:  (504) 616-5226
Email:  fcdlaw@aol.com

**Attorneys for Plaintiffs**